William L. Mentlik
Roy H. Wepner
LERNER, DAVID, LITTENBERG,
  KRUMHOLZ & MENTLIK, LLP
600 South Avenue West
Westfield, NJ 07090-1497
Tel:    908.654.5000
Fax:    908.654.7866

*Attorneys for Plaintiff Waddington North America, Inc.*

**Document Filed Electronically**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| WADDINGTON NORTH AMERICA, INC., | : | Civil Action No. 09-4883-JAG-MCA |
| | : | |
| Plaintiff, | : | District Judge Joseph A. Greenaway, Jr. |
| v. | : | Magistrate Judge Madeline Cox Arleo |
| | : | |
| SABERT CORPORATION, | : | Return Date: January 19, 2010 |
| | : | Time:  10:00 a.m. |
| Defendant. | : | **ORAL ARGUMENT REQUESTED** |
| | x | |

**MEMORANDUM OF PLAINTIFF WADDINGTON
NORTH AMERICA, INC. IN SUPPORT OF ITS MOTION
TO DISMISS COUNTERCLAIMS, STRIKE AFFIRMATIVE
<u>DEFENSE, AND STRIKE CLAIM FOR VIOLATION OF LOCAL RULE 8.1</u>**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ............................................................................ iii

I.  INTRODUCTION ................................................................................1

II.  BACKGROUND ..................................................................................2

    A.  Sabert's Declaratory Judgment Action.................................................2

    B.  WNA's Infringement Action .............................................................4

III.  ARGUMENT ......................................................................................5

    A.  Sabert Has Not Advanced "Plausible" Theories....................................5

    B.  Sabert's Defenses And Counterclaim Asserting Inequitable
        Conduct Are Legally Insufficient .....................................................5

        1.  The Legal Standard For Pleading Inequitable
            Conduct ...........................................................................6

        2.  Sabert's Pleading Of Inequitable Conduct Is
            Completely Deficient .........................................................7

            a.  Sabert's Affirmative Defenses .....................................7

            b.  Sabert's Fourth Counterclaim......................................9

                i.  The Alleged False Claims Of Commercial
                   Success..........................................................9

                ii.  The Alleged Withholding Of  References
                   Unknown To WNA ...........................................13

                iii.  Sabert's Unidentified "Additional" Examples....................17

    C.  Sabert's Claim Of Tortious Interference Is Preempted By
        Federal Patent Law ......................................................................17

        1.  Sabert Cannot Plausibly Allege  Assertion Of A
            Patent Known To Be Invalid..............................................19

        2.  Sabert's Admission Of Infringement Precludes A
            Plausible Claim That WNA Asserted A Patent
            Known Not To Be Infringed ...............................................20

        3.  Sabert's Previous Failure To Plead Inequitable
            Conduct  Precludes A Plausible Assertion That
            WNA "Knew" Its  Patent Was Unenforceable Due
            To Inequitable Conduct.....................................................21

i

4.    Assertions Against Sabert Itself Cannot Be Tortious
Interference ................................................................................................22

D.    Sabert's Demand For A Specific Amount  Of Unliquidated
Damages Should Be Stricken.................................................................23

IV.    CONCLUSION.............................................................................................25

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) ...................................................................5

*B.C. and L.T. v. Long Hill Twp. Bd. of Educ.*,
No. 06-5410, 2009 WL 3835935 (D.N.J. Nov. 16, 2009).................................5

*Bell Atl. Corp. v. Twombly*,
127 S. Ct. 1955 (2007) ....................................................................................5

*In re Burlington Coat Factory Sec. Litig., Inc.*,
114 F.3d 1410 (3d Cir. 1997) .........................................................................7

*Burlington Indus., Inc. v. Dayco Corp.*,
849 F.2d 1418 (Fed. Cir. 1988) ......................................................................6

*Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*,
256 F. Supp. 2d 249 (D.N.J. 2003)................................................................22

*Exergen Corp. v. Wal-Mart Stores, Inc.*,
575 F.3d 1312 (Fed. Cir. 2009) .............................................................*passim*

*Ferguson Beauregard/Logic Controls, Div. of*
*Dover Res., Inc. v. Mega Sys., LLC*,
350 F.3d 1327, 1344 (Fed. Cir. 2003)).........................................................6

*Hunter Douglas, Inc. v. Harmonic Design, Inc.*,
153 F.3d 1318 (Fed. Cir. 1998) .....................................................................18

*Kimberly-Clark Corp. v. Johnson & Johnson*,
745 F.2d 1437 (Fed. Cir. 1984) .....................................................................14

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*,
381 F.3d 1142 (Fed. Cir. 2004) .....................................................................21

*Lightning Lube, Inc. v. Witco Corp.*,
4 F.3d 1153 (3d Cir. 1993) ............................................................................22

*Nordberg, Inc. v. Telsmith, Inc.*,
82 F.3d 394 (Fed. Cir. 1996) .........................................................................11

*In re Omeprazole Patent Litig.*,
536 F.3d 1361 (Fed. Cir. 2008) .....................................................................21

*Sabert Corp. v. Waddington N. Am., Inc.*,
No. 06-5423-JAG-MCA ("the DJ Action")....................................................3

*Serio-U.S. Indus., Inc. v. Plastic Recovery Techs. Corp.*,
    459 F.3d 1311 (Fed. Cir. 2006) ......................................................................18

*Zenith Elecs. Corp. v. Exzec, Inc.*,
    182 F.3d 1340 (Fed. Cir. 1999) ...............................................................17, 18

**Statutes, Rules & Other Authorities**

    15 U.S.C. § 1125(a) ........................................................................................17

    *Manual of Patent Examining Procedure* § 2001.01 .........................................10

## I.    __INTRODUCTION__

In 2006, defendant Sabert Corporation ("Sabert") decided to copy the successful line of metallized cutlery being sold by plaintiff Waddington North America, Inc. ("WNA") under the brand REFLECTIONS, which was protected by a patent that clearly covered Sabert's product.  In conjunction with that launch, Sabert attacked WNA's patent, asserting that the patent was invalidated by a short-lived product known as "Spirit," which was dramatically different from WNA's REFLECTION products.  And believing that the best defense to a possible infringement suit was a good offense, Sabert launched a declaratory judgment action in this Court against WNA.

WNA, in an effort to make full disclosure, voluntarily and promptly sought reexamination of its own patent before the Patent and Trademark Office ("PTO") and brought to the PTO's attention the "Spirit" prior art and all other pertinent prior art of which WNA was aware.  After WNA amended the claims of its patent, the PTO confirmed that 40 amended and new claims of WNA's patent were valid over the "Spirit" prior art asserted by Sabert and all other prior art of record.  And while the claims of WNA's patent were amended, Sabert was still infringing that patent — as Sabert has now admitted in this litigation.

With the "Spirit" prior art having failed to achieve Sabert's objective, Sabert has now filed an answer and counterclaims attacking the PTO for reaching a conclusion that materially diminishes Sabert's prospects in this litigation.  Moreover, Sabert goes further and attacks WNA for protecting and enforcing WNA's valid intellectual property rights in WNA's successful REFLECTIONS metallized cutlery, as WNA is manifestly permitted by law to do.

All of Sabert's allegations are — at best — baseless and in many cases defamatory. Sabert's defenses and counterclaims are misguided and ill informed.  WNA categorically denies

that it acted improperly in any way in prosecuting and enforcing its patent. But some of Sabert's allegations are even worse: they do not even rise to the level of being legally sufficient.

Accordingly, WNA respectfully submits this memorandum in support of its motion to dismiss Sabert's "Fourth Counterclaim" asserting inequitable conduct pursuant to Fed. R. Civ. P. 12(b)(6), and to strike paragraphs 18 and 19 of Sabert's pleading asserting inequitable conduct as an affirmative defense pursuant to Fed. R. Civ. P. 12(f).

WNA also seeks dismissal of Sabert's spurious "Seventh Counterclaim" alleging tortious interference relating to WNA's assertion of its patent on the basis that this state law claim is preempted by federal patent law, since Sabert has not pleaded a plausible theory — and surely could never prove — that WNA acted in bad faith in any way. WNA also asks this Court to strike paragraph 319 of Sabert's pleading and paragraph 11 of Sabert's prayer for relief which — for the second time in three years — demands an arbitrary dollar amount of unliquidated damages in clear violation of Local Civil Rule 8.1.

Sabert initially advanced these defective and legally insufficient claims and defenses in an original answer and counterclaims filed December 1, 2009. (Dkt.13.) Thereafter, when WNA gave notice that Sabert's claims were legally insufficient and sought (and obtained) leave to file this motion (Dkt.16), Sabert responded with an amended pleading filed December 17, 2009 (Dkt.18).

As WNA will demonstrate, rather than cure the legal deficiencies in Sabert's original pleading, Sabert has exacerbated them.

## II.    BACKGROUND

### A.    Sabert's Declaratory Judgment Action

WNA is the owner of U.S. Patent No. 6,983,542 ("the '542 Patent"), which relates to metallized plastic cutlery products. In August 2006, Sabert initiated correspondence with WNA,

citing prior art relating to the so-called "Spirit" cutlery products, which — according to Sabert — rendered WNA's '524 Patent invalid.  On November 13, 2006, Sabert filed an action in this Court seeking a declaratory judgment that the '542 Patent was not infringed by Sabert (Count One) and was invalid (Count Two).  *Sabert Corp. v. Waddington North Am., Inc.*, No. 06-5423-JAG-MCA ("the DJ Action").  Sabert's complaint in the DJ Action also included a separate Count Three that purported to seek damages as a remedy in connection with its request for declaratory relief.

On November 22, 2006, *i.e.*, after Sabert's commencement of the DJ Action but before WNA was served, WNA filed a request for *ex parte* reexamination of its '542 Patent in the PTO, citing the "Spirit" prior art that had been brought to WNA's attention by Sabert.  Thereafter, on January 17, 2007, WNA filed a motion with this Court to dismiss the declaratory judgment claims or, in the alternative, to stay or administratively terminate the action pending the outcome of the reexamination.  (DJ Action Dkt.6.)  In the same motion, WNA requested dismissal of Sabert's Count Three, which sought damages associated with Sabert's request for declaratory relief, as legally insufficient.  WNA also requested that this Court strike Sabert's pleading, which asserted that such damages incurred by Sabert were "believed to be in excess of at least $500,000" (citing DJ Action Dkt.1 ¶ 37), as violating Local Rule 8.1.

On September 14, 2007, this Court issued an Opinion (DJ Action Dkt.14) and an Order (*id.* Dkt.15) denying WNA's motion to dismiss, granting WNA's motion to stay, and granting WNA's motion to dismiss Sabert's claim for damages as set forth in Count Three of Sabert's complaint.  On March 13, 2008, this Court issued a further order administratively terminating the DJ Action without prejudice to the rights of the parties to reopen the proceedings.  (*Id.* Dkt.18.)

### B.   <u>WNA's Infringement Action</u>

On September 22, 2009, the reexamination of WNA's '542 Patent officially concluded with the issuance of an *ex parte* reexamination certificate.  As made clear in that certificate, certain original claims were canceled; other original claims were held patentable as amended over all prior art of record; and certain new claims that had been added during the reexamination were held patentable over all of the prior art.  On September 23, 2009, WNA filed this action against Sabert for infringement of the reexamined '542 Patent.

Sabert initially filed a 69-page responsive pleading in this infringement action on December 1, 2009, asserting a series of affirmative defenses and a total of six counterclaims (Dkt.13), which was followed by its 87-page amended pleading (Dkt.18) adding yet another counterclaim.   Paragraphs 18 and 19 of Sabert's affirmative defenses purport to assert unenforceability due to inequitable conduct, while Sabert's "Fourth Counterclaim" seeks a declaratory judgment of unenforceability due to inequitable conduct.

Sabert's "Seventh Counterclaim" asserts tortious interference with prospective economic advantage and contractual relations.   The only conduct specifically identified in this counterclaim is a November 6, 2009 letter written by WNA to customers and potential customers relating to the '542 Patent and Sabert's infringement thereof.  (*See* Dkt.18 ¶ 308.)   Sabert's "Seventh Counterclaim" claims that WNA's actions have caused Sabert lost sales and damages in an amount not yet fully determined but "believed to be in excess of at least $500,000." (*Id.* ¶ 319.)   In similar fashion, Sabert's prayer for relief (which is not expressly tied to Sabert's "Seventh Counterclaim" or any other counterclaim) likewise seeks damages "in the amount of at least $500,000. (*Id.* at 87, ¶ 11.)

III.   **ARGUMENT**

A.   **Sabert Has Not Advanced "Plausible" Theories**

In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009), the Supreme Court significantly altered the pleading standards to require more than a "formulaic recitation of the elements of a cause of action . . . ." *Twombly*, 127 S. Ct. at 1965; *Iqbal*, 129 S. Ct. at 1949. The Supreme Court held that to survive a motion to dismiss, the complaint must contain sufficient factual matter which, if accepted as true, would state a claim that is "plausible on its face." *Iqbal*, 129 S. Ct at 1949. This requires "more than a sheer possibility that a defendant has acted unlawfully," and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

Pleadings that are "no more than conclusions, are not entitled to the assumption of truth." *B.C. and L.T. v. Long Hill Twp. Bd. of Educ.*, No. 06-5410, 2009 WL 3835935, at *3 (D.N.J. Nov. 16, 2009) (quoting *Iqbal*, 129 S. Ct. at 1950). "A court will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations." *Id.*

As discussed *infra*, Sabert's inequitable conduct and tortious interference claims fail to advance "plausible" scenarios in support of Sabert's claims. And as WNA will demonstrate, those are not the *only* problems with Sabert's pleadings.

B.   **Sabert's Defenses And Counterclaim Asserting**
**Inequitable Conduct Are Legally Insufficient**

Sabert's allegations notwithstanding, WNA is confident that it never withheld material information from the PTO or otherwise acted improperly in its dealings with the PTO. Sabert's allegations of inequitable conduct are inappropriate, defamatory, and insulting. But for present purposes, only one defect in Sabert's pleading matters: its allegations of inequitable conduct are legally insufficient.

5

1.      **The Legal Standard For Pleading Inequitable Conduct**

More than two decades ago, the Federal Circuit made clear its view as to unsupportable

charges of inequitable conduct:

> [T]he habit of charging inequitable conduct in almost every major patent case has
> become an absolute plague.  Reputable lawyers seem to feel compelled to make the
> charge against other reputable lawyers on the slenderest grounds, to represent their
> client's interests adequately, perhaps.  They get anywhere with the accusation in but a
> small percentage of the cases, but such charges are not inconsequential on that account.
> They destroy the respect for one another's integrity, for being fellow members of an
> honorable profession, that used to make the bar a valuable help to the courts in making
> a sound disposition of their cases, and to sustain the good name of the bar itself.  A
> patent litigant should be made to feel, therefore, that an unsupported charge of
> "inequitable conduct in the Patent Office" is a negative contribution to the rightful
> administration of justice.

*Burlington Indus., Inc. v. Dayco Corp.*, 849 F.2d 1418, 1422 (Fed. Cir. 1988).  Sabert's present

allegations of inequitable conduct are as "unsupported" as they get; and they are also insufficient

as a matter of law.

In *Exergen Corp. v. Wal-Mart Stores, Inc.*, 575 F.3d 1312 (Fed. Cir. 2009), the court had

occasion to review (and ultimately affirm) a district court's denial of a defendant's motion to add

inequitable conduct as an affirmative defense on counterclaim.  The court initially noted that

Rule 9(b) of the Federal Rules of Civil Procedure requires that averments of fraud be made with

particularity.  While acknowledging that inequitable conduct is a broader concept than fraud, the

Federal Circuit reaffirmed that inequitable conduct must be pled with particularity under

Rule 9(b).  *Exergen*, 575 F.3d at 1326 (citing *Ferguson Beauregard/Logic Controls, Div. of

Dover Res., Inc. v. Mega Sys., LLC*, 350 F.3d 1327, 1344 (Fed. Cir. 2003)).  The Federal Circuit

went on to hold in *Exergen* that:

> [I]n pleading inequitable conduct in patent cases, Rule 9(b) requires identification of the
> specific who, what, when, where, and how of the material misrepresentation or
> omission committed before the PTO.

*Exergen*, 575 F.3d at 1327.

The court in *Exergen* acknowledged that Rule 9(b) states that malice, intent, knowledge, and other conditions of mind may be averred generally.   However, it noted that precedent "requires that the pleadings allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind."  *Id.* (citing, *inter alia*, *In re Burlington Coat Factory Sec. Litig., Inc.*, 114 F.3d 1410, 1418 (3d Cir. 1997) ("While state of mind may be averred generally, plaintiffs must still allege facts that show the court their basis for inferring that the defendants acted with 'scienter.'")).

The Federal Circuit in *Exergen* summarized its pleading standard for inequitable conduct thusly:

> In sum, to plead the "circumstances" of inequitable conduct with the requisite "particularity" under Rule 9(b), the pleading must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO.  Moreover, although "knowledge" and "intent" may be averred generally, a pleading of inequitable conduct under Rule 9(b) must include sufficient allegations of underlying facts from which a court may reasonably infer that a specific individual (1) knew of the withheld material information or of the falsity of the material misrepresentation, and (2) withheld or misrepresented this information with a specific intent to deceive the PTO.[5]

_____

5. A reasonable inference is one that is plausible and that flows logically from the facts alleged, including any objective indications of candor and good faith. . . . Whereas an inference of deceptive intent must be reasonable and drawn from a pleading's allegations of underlying fact to satisfy Rule 9(b), this inference must be "the *single most reasonable* inference able to be drawn from the evidence to meet the clear and convincing standard."  [*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357,] 1366 [(Fed. Cir. 2008)].

*Exergen*, 575 F.3d at 1328-29 (emphasis in original).

## 2.     Sabert's Pleading Of Inequitable Conduct Is Completely Deficient

### a.     Sabert's Affirmative Defenses

We begin with Sabert's affirmative defenses.  Paragraph 18 of Sabert's defenses states:

18. One or more claims of the '542 Patent are void, invalid, and unenforceable by virtue of the failure of the patentee to act with the degree of candor and good faith

required of persons who prepare or prosecute a patent application before the United
States Patent and Trademark Office ("USPTO" or "PTO"), including the failure to
disclose material prior art and the failure to disclose information known to the patentee
and/or persons having substantial responsibility for the prosecution of the
patents-in-suit.

(Dkt.18, at 4.)

This allegation is blatantly deficient by any standard.  While *Exergen* and earlier cases
make clear that inequitable conduct must be pleaded with particularity, paragraph 18 contains *no*
particulars whatsoever.  It is nothing more than a boilerplate regurgitation of *some* (but not even
all) of the elements of inequitable conduct.  But as the Federal Circuit has stated: "A pleading
that simply avers the substantive elements of inequitable conduct, without setting forth the
particularized factual bases for the allegation, does not satisfy Rule 9(b)."  *Exergen*, 575 F.3d
at 1326-27.

Paragraph 19 of Sabert's pleading alleges as follows:

19. The reexamined '542 Patent *and its affiliated patents* are unenforceable due to
inequitable conduct of those involved in the application for the '542 Patent during its
procurement and reexamination before the U.S. Patent and Trademark Office, *for at
least* the reasons alleged with particularity in the counterclaim which follows, which
allegations are hereby incorporated by reference.

(Dkt.18, at 4-5 (emphasis added).)

We assume that when Sabert referred to "the counterclaim which follows," Sabert was
referring to its "Fourth Counterclaim," which will be discussed momentarily.  But even if
Sabert's "Fourth Counterclaim" properly alleges inequitable conduct — and plainly it does
not — paragraph 19 is still improper because it is not limited to the reasons set forth in the
"Fourth Counterclaim," but purports to plead inequitable conduct "for *at least* the reasons
alleged . . ." in the counterclaims.  Because such an allegation is broad enough to encompass
possible grounds for inequitable conduct that are neither pleaded with particularity in the

counterclaims, nor pleaded in any other fashion by Sabert, paragraph 19 is insufficient, and should be stricken under Rule 12(f).

Moreover, paragraph 19 asserts that one or more unidentified "affiliated patents" are also unenforceable for inequitable conduct.  This additional lack of particularity is especially improper here, given that the '542 Patent is the only patent-in-suit.

Accordingly, because paragraphs 18 and 19 of Sabert's affirmative defenses are insufficient on their face, and because they incorporate Sabert's "Fourth Counterclaim," which itself is legally deficient as well (as will now be shown), paragraphs 18 and 19 should be stricken pursuant to Rule 12(f).

### b.      Sabert's Fourth Counterclaim

#### i.      The Alleged False Claims Of Commercial Success

Broadly speaking, to the extent WNA understands it, the initial portion of Sabert's "Fourth Counterclaim" (*i.e.,* Dkt.18 ¶¶ 219-37) relates to the fact that during prosecution of the original '542 Patent and during the subsequent reexamination, individuals associated with WNA submitted declarations establishing "commercial success" of WNA's invention as a basis to demonstrate nonobviousness.  Sabert's initial theory of inequitable conduct appears to be that some factors other than the intrinsic worth of the invention contributed to that success, including certain equipment designed by an outside vendor known as D2 In-line Solutions, LLC.

Whatever Sabert's theory might be, and aside from its clear lack of merit, it is not even close to properly pleaded under the standards set forth in *Exergen*.  As noted above, the Federal Circuit held that Rule 9(b) requires identification of the specific who, what, when, where, and how a material misrepresentation or omission was committed before the PTO.  *Exergen*, 575 F.3d at 1327.  Sabert's allegations fail on multiple grounds.

In the present case, there is little, if any, need to go beyond the question of "who?"  In *Exergen*, the pleading referred generally to "Exergen, its agents and/or attorneys" but "fail[ed] to name the specific individual associated with the filing or prosecution of the application issuing as the [patent-in-suit], who both knew of the material information and deliberately withheld or misrepresented it."  *Id.* at 1329.  The Federal Circuit stressed the fact that 37 C.F.R. § 1.56(a) gives *individuals* a duty of candor and good faith, and that the PTO's *Manual of Patent Examining Procedure* ("M.P.E.P.") explains that "the duty applies only to individuals, not to organizations."  *Exergen*, 575 F.3d at 1329 (citing M.P.E.P. § 2001.01).

Sabert's "Fourth Counterclaim" does not remotely address the question of "who."  It is replete with vague allegations attributing wrongful acts to "WNA" without identifying any individual who had a duty of candor and violated that duty.  These are some examples, beginning on page 56 of Sabert's pleading (Dkt.18) (all emphasis added)):

219.        . . . "**WNA** prepared, filed and prosecuted a patent application" . . . .

220.        . . . "**WNA** made material false representations" . . . .

221.        . . . "**WNA** submitted several declarations **of WNA's representatives and officers**" . . . .

222.        "**WNA's** submitted declarations attesting to the causal relation or nexus between the invention allegedly covered by the '542 Patent and the commercial success of WNA's Reflections™ line of metalized plastic cutlery" . . . .

223.        The PTO held an interview with "**representatives of WNA** attending" at which interview "WNA" allegedly provided certain explanations.

224.        "As a result of **WNA's explanations**," the PTO examiner agreed that the secondary considerations were sufficient to overcome the obviousness rejection.

227.        During the subsequent reexamination, "**WNA** once again submitted similar declarations . . . ."

228.        . . . "**WNA knew or should have known**" that the commercial success was allegedly not the result of the inventiveness or novelty of the invention.

234.        . . . "**WNA knew or should have known**" that its assertions and declarations regarding commercial success were not the result of inventiveness or novelty.

235.      . . . "**WNA knew or should have known**" that its representations were materially false.

237.      . . . "**WNA knew or should have known**" that its representations were false.

238.      . . . "**WNA's** false representations and/or failure to disclose to the USPTO" the aforementioned information "was intentional and was intended to mislead and/or deceive" the PTO.

Without question, precisely as occurred in *Exergen*, Sabert has failed to identify the individual or individuals who allegedly violated a duty of candor and good faith in connection with the claim of commercial success.  By failing to satisfy the "who" prong of the *Exergen* standard, Sabert has failed to properly assert a claim of inequitable conduct.  Instead of doing so, Sabert has simply attacked the integrity of the entire WNA organization and its outside counsel with a broad brush.  But under *Exergen*, that is precisely what a litigant is *not* permitted to do.

As made clear above, many of Sabert's nonspecific allegations are in the nature of "WNA knew or should have known" certain things.  (*See, e.g.*, ¶¶ 228, 234, 235, 237 above.)  Less egregious pleading misconduct was condemned in *Exergen*.  There, the pleading had stated that "Exergen was aware" of certain facts.  But the pleading failed to provide any factual basis "to infer that any specific individual, who owed a duty of disclosure" to the PTO, knew of the information in question.  *Exergen*, 575 F.3d at 1330.  Here, the situation is even worse: Sabert did not allege that "WNA" actually knew certain facts; it alleged only that WNA "knew *or should have known*."  This is plainly insufficient.  *See, e.g., Nordberg, Inc. v. Telsmith, Inc.*, 82 F.3d 394, 397 (Fed. Cir. 1996) (rejecting argument that inequitable conduct can be found where individual merely "should have known" of material information).

Sabert's pleading also fails to answer the question of "when" the allegedly material representations took place.  Sabert simply asserts that false representations in declarations were submitted during the original prosecution of the '542 Patent and the reexamination of the

'542 Patent.  (Dkt.18 ¶¶ 220, 221.)  The original prosecution spanned a period of almost three and a half years, and the reexamination was pending for close to three additional years.  In both proceedings, there were numerous filings.  Nowhere does Sabert's "Fourth Counterclaim" explain "when" during these two lengthy proceedings the alleged misrepresentations took place.

Still further, Sabert alleges that the information provided to the PTO regarding WNA's commercial success constituted "material" false information and representations.  (Dkt.18 ¶ 237.)  In *Exergen*, the Federal Circuit explained that naked allegations of "materiality" are insufficient, and that an accused infringer must allege facts explaining the "why" and "how" of materiality.  *Exergen*, 575 F.3d at 1329-30.

While Sabert's pleading discusses WNA's prosecution histories at length, Sabert omits any reference to an Information Disclosure Statement ("IDS") filed by WNA in the reexamination on March 5, 2009.  That IDS provided the PTO with a Declaration of Donald M. Mattox, which recited Sabert's position as to how the commercial success of WNA's product purportedly resulted from D2 equipment.  Sabert, of course, is aware of this: Mr. Mattox is *Sabert's* expert; his declaration was prepared and sent to WNA by *Sabert's* counsel; and WNA promptly submitted it to the PTO.

Accordingly, Sabert has not — and could not — allege facts establishing a plausible case of materiality regarding the D2 equipment, since Sabert's own expert presented the argument to the PTO, and the PTO rejected it.

While the foregoing deficiencies would be a sufficient basis to dismiss this portion of Sabert's "Fourth Counterclaim," they are not the only basis on which the Court should do so.  As noted above, Rule 9(b) requires that pleadings allege sufficient underlying facts from which a court may reasonably infer that a party acted with a requisite state of mind, *i.e.*, deceptive intent.

*Exergen*, 575 F.3d at 1327.   Indeed, Sabert's only allegations having any relationship to deceptive intent are set forth in paragraphs 237 and 238, which simply state that WNA's representations were known to be false, were intentional, and were "intended to mislead and/or deceive the USPTO."

This, too, is reminiscent of *Exergen*.  There, as here, "the facts that are alleged do not give rise to a reasonable inference of scienter, including both (1) knowledge of the withheld material information or of the falsity of the material misrepresentation, and (2) specific intent to deceive the PTO." *Id.* at 1330.  In *Exergen*, as here, the allegedly false statement to the PTO was purportedly contradicted by other facts (in *Exergen*, it was a statement on the patentee's Web site).  But as the Federal Circuit explained:

> As for the alleged misrepresentation, any knowledge of its alleged falsity is similarly deficient.  No facts are alleged from which one can reasonably infer that, at the time of the allegedly false statement, the individual who made this statement to the PTO was aware of an allegedly contradictory statement on Exergen's website.

*Id.* Here, too, in connection with Sabert's theory of inequitable conduct regarding the claim of commercial success, Sabert alleges no underlying facts from which one could plausibly infer any knowledge of the purported contradiction or an intent to deceive; nor would Sabert have a nonfrivolous basis to do so.

Accordingly, on numerous grounds, Sabert's allegation of inequitable conduct relating to WNA's assertions of commercial success are factually unsupported and unsupportable, are legally baseless, and should be dismissed.

### ii.   The Alleged Withholding Of References Unknown To WNA

In paragraphs 239-260 of its amended Fourth Counterclaim, Sabert levels a legally baseless charge of inequitable conduct under a theory that was rejected by the Federal Circuit

some 25 years ago.  It accuses WNA and/or its counsel (again, failing to answer *Exergen's* "who" question) of withholding references they did not even know about.

With regard to a 1998 article by Vergason and Gaur (*see* Dkt.18 ¶ 239) and a group of three other patent references[1] (*see id.* ¶ 251), Sabert alleges that "WNA and/or WNA's counsel, as standard practice, would have conducted prior art searches . . ."; therefore, "WNA and/or WNA's counsel had actual or constructive knowledge" of these references (*id.* ¶¶ 242, 255). Sabert accuses WNA of withholding these references — of which WNA allegedly had "actual or constructive knowledge" — with an intent to deceive.  (*Id.* ¶¶ 244, 258.)

In *Kimberly-Clark Corp. v. Johnson & Johnson*, 745 F.2d 1437 (Fed. Cir. 1984), the accused infringer convinced a trial court to find "fraud on the PTO" (inequitable conduct in today's parlance) on a theory that a "patent applicant is presumed to have knowledge of the existence of material prior art."  *Id.* at 1449.  The Federal Circuit, per Judge Rich, described this theory as "a witches' brew which could do untold damage to patentees if ingested into the body of patent law."  (*Id.*)  He characterized the attempted combination of "fraud by failure to disclose" with the "presumption of knowledge of prior art" as being "on a par with terrorism." *Id.*

Concluding that the foregoing theory led to "an absurd result . . . not to be condoned," the court held:

> [T]he presumption of the inventor's knowledge of the prior art, long treated as axiomatic in patent law, is not to be applied in connection with the duty of candor and the obligation to disclose material prior art to the PTO—limiting the obligation to disclose material prior art actually known to the inventor or his assigns, agents, and attorneys. *See* 37 CFR 1.56.

---

[1] The three references are Eggleston, U.S. Patent No. 432,991; McMahon, U.S. Patent No. 3,939,834; and Pluim, U.S. Patent No. 6,322,859.

*Id.* at 1450.  The court went on to "declare the presumption that the inventor has knowledge of all material prior art to be dead."  *Id.* at 1454.

Sabert's theory that a defense of inequitable conduct can be based on references of which WNA had only "constructive knowledge" is an attempt to resurrect a theory that has been dead and buried since 1984.  It is as legally insufficient today as it was then.

Stripped of this "constructive knowledge" theory, Sabert has no basis to allege that anyone associated with WNA had *actual* knowledge of these references at a time they could have been cited to the PTO.  As discussed above in Part III.A, a pleading must allege facts that would make a claim plausible on its face.  Sabert has not done so, and could not do so.

Sabert's theory that WNA, as standard practice, conducts prior art searches would necessarily apply *to Sabert itself*, since Sabert asserts that "Sabert and WNA are competitors in the disposable plastic cutlery business."  (Dkt.18 ¶ 31.)  We also know that when Sabert possessed *other* prior art it considered relevant to WNA's '542 Patent (viz., the "Spirit" prior art), Sabert brought it to WNA's attention (*id.* ¶ 39), and WNA brought it to the PTO's attention (*id.* ¶ 47).

Thus, unless Sabert knew about this additional prior art and deliberately held it back from WNA so it could later "sandbag" WNA, the most plausible set of facts is that *Sabert itself* didn't know about the references when they could have been cited in the reexaminations — and neither did WNA.

The only specific "facts" that purport to suggest *actual* knowledge of one of these allegedly "withheld" references appear in paragraphs 243 and 244, where Sabert asserts that WNA's CEO, Michael G. Evans, "had actual or constructive knowledge of Vergason Technology, Inc.'s technology" including the Vergason article published in 1998 (three years

*before* the effective filing date of the '542 Patent). On what is this based? That in October *2004* (three years *after* the effective filing date of the '542 Patent and a year *after* WNA's launch of its REFLECTIONS products), Mr. Evans submitted a declaration that Vergason Technology, Inc. was then promoting a service to produce a product that copied WNA's REFLECTIONS™ product sold under what would become the '542 Patent. Plausible? Specious is a better description. The only reasonable inference the hard facts would support is that Vergason Technology, Inc. first learned about making metallized cutlery *from WNA's launch of REFLECTIONS*. Thus, while WNA would categorically deny this allegation by Sabert if required to reply, WNA should not even be required to do so.

Apart from that bit of spurious character assassination, Sabert's allegations relating to the alleged withholding of references unknown to WNA suffer from the same violations of the *Exergen* standards, and more. Again, there is no answer to the basic "who" and "when" questions. Moreover, *Exergen* noted that the pleading in question "failed[ed] to identify which claims, and which limitations in those claims, the withheld references are relevant to, and where in those references the material information is found—i.e., the 'what' and 'where' of the material omissions." *Exergen*, 575 F.3d at 1329. Sabert's allegations regarding the unknown Vergason reference and the three unknown patent references are equally deficient.

Similarly, as noted above, in *Exergen*, the pleading asserted that the withheld references were material and not cumulative, but did not identify the particular claim limitations that were allegedly absent from the cited references of record — the "why" and "how" as to materiality. *Id.* at 1329-30. In this regard as well, Sabert simply says Vergason (Dkt.18 ¶ 246) and the three patent references (*id.* ¶ 257) are material, but nowhere alleges what the references disclose that

was not disclosed in any of dozens of references cited in the original examination and the reexamination of the '542 Patent.

### iii.     Sabert's Unidentified "Additional" Examples

Sabert begins its "Fourth Counterclaim" by saying that "[e]xamples of [WNA's] inequitable conduct are discussed below, and Sabert believes that additional examples are likely to have evidentiary support after a reasonable opportunity for further investigation and discovery."  (Dkt.18 ¶ 218.)   As was the case with Sabert's ¶ 19 (discussed above in Part III.B.2.a), this is the antithesis of a particularized pleading; it amounts to an open-ended pleading; and it should be dismissed.

*       *       *

Thus, it is clear that, on several grounds, Sabert has failed to properly plead inequitable conduct.  Accordingly, Sabert's "Fourth Counterclaim" should be dismissed for failure to state a claim upon which relief can be granted.

### C.     Sabert's Claim Of Tortious Interference Is Preempted By Federal Patent Law

With regard to tortious interference, as was the case with inequitable conduct, WNA contends that its communications with customers were completely accurate and were an appropriate exercise of WNA's rights under the patent laws.  Sabert's attempt to convert these communications into tortious interference are misguided and futile and they are insufficient as a matter of law.

In *Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340 (Fed. Cir. 1999), the Federal Circuit confronted claims relating to assertion of a patent in the marketplace.  The accused infringer alleged that the exclusive licensee of the patent violated federal law; namely, Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); and alleged a state law claim of tortious interference.  In first analyzing the tension between the federal Section 43(a) claims and the

federal patent laws, the court initially noted that a patentee's statements regarding its patent rights are conditionally privileged under the patent laws, so that such statements are not actionable unless made in bad faith.  *Id.* at 1353.  The court concluded that before a patentee may be held liable under Section 43(a) for marketplace activity in support of its patent, and thus be deprived of the right to make statements about potential infringement of its patent, the marketplace activity must have been undertaken in bad faith.  *Id.*

Turning to the state law claim of tortious interference, the Federal Circuit noted that in *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318 (Fed. Cir. 1998), the court had previously held that state tort claims, including tortious interference claims, which were based on publicizing the patent in the marketplace are not preempted by the patent laws if the claimant can show that the patent holder acted in bad faith in its publication of the patent.  *Zenith*, 182 F.3d at 1355.  Thus, "to avoid patent law preemption of such state law tort claims, bad faith must be alleged and ultimately proven, even if bad faith is not otherwise an element of the tort claim." *Id.*; *see also Serio-U.S. Indus., Inc. v. Plastic Recovery Techs. Corp.*, 459 F.3d 1311, 1320 (Fed. Cir. 2006).

As to what constitutes bad faith, the Federal Circuit noted in *Zenith*, "Obviously, if the patentee knows that the patent is invalid, unenforceable, or not infringed, yet represents to the marketplace that a competitor is infringing the patent, a clear case of bad faith representations is made out." *Zenith*, 182 F.3d at 1354.

Sabert's pleading does assert — on information and belief and with *no* underlying facts — that WNA acted in bad faith.  (Dkt.18 ¶ 316.)  However, as WNA will explain, Sabert has not alleged — and could not responsibly allege — any plausible set of *facts* that could be characterized as tortious interference by WNA that was undertaken in bad faith.

As noted above, the Federal Circuit has stated that asserting a patent that is known to be invalid, unenforceable, or not infringed would amount to bad faith, and Sabert might attempt to shoehorn its pleading into this category.  Any such effort would be doomed to fail.  Sabert has not sufficiently alleged any facts to support a plausible theory of "bad faith" that would avoid federal preemption.  Indeed, the only plausible set of facts points in the opposite direction.

### 1.   Sabert Cannot Plausibly Allege Assertion Of A Patent Known To Be Invalid

To the extent Sabert's theory is that WNA necessarily "knew" that it was asserting an invalid patent, when all is said and done, Sabert appears to be suggesting that WNA must have had this "knowledge" *simply because Sabert said it was true*.  (*See* Dkt.18 ¶ 309.)  But this could not possibly suffice, since virtually *all* infringers assert to virtually *all* patent owners that their patents are invalid.  An infringer cannot turn a patent owner into a tortfeasor simply by spouting its self-serving opinion that the patent is invalid.

Moreover, reducing the plausibility of bad faith even further is the fact (pleaded in copious detail by Sabert) that the PTO *confirmed* the patentability of WNA's reexamined claims in the face of the "Spirit" prior art on which Sabert had relied.  (*See* Dkt.18 ¶¶ 39-40, 90-138.)  And the only communication to customers to which Sabert specifically refers is a letter dated November 6, 2009 (*see id.* ¶ 308, Exh. E) — *i.e., after* the September 22, 2009 issuance of the '542 reexamination certificate, which confirmed the patentability of the amended and new claims over Sabert's "Spirit" prior art and dozens of other prior art references.

Thus, to allege (and ultimately prove) bad faith based upon assertion of a patent known to be invalid, Sabert would need to plead and prove that when WNA wrote the November 6, 2009 letter, WNA *knew* that the PTO had been mistaken in issuing a favorable reexamination

certificate *simply because Sabert said so*.  It is hard to imagine a less "plausible" case of bad faith.

> ## 2.   Sabert's Admission Of Infringement Precludes A Plausible Claim That WNA Asserted A Patent Known Not To Be Infringed

Nor could Sabert plausibly argue bad faith on a theory that WNA asserted the '542 Patent knowing it was not infringed, for at least the reason that Sabert has now *admitted* its infringement of the reexamined '542 Patent.   First, WNA alleged in its complaint that "Sabert . . . has committed acts of infringement within the State of New Jersey and within this judicial district . . . ."  (Dkt.1 ¶ 5.)  Indeed, Sabert has now twice *admitted* this entire allegation without qualification.  (Dkt.13 ¶ 3; Dkt.18 ¶ 3.)

Second, in its "First Counterclaim" seeking a declaratory judgment of noninfringement, Sabert asserts three grounds on which it believes it does not infringe the reexamined '542 Patent. (Dkt.18 ¶¶ 144, 145.)  Two of these grounds appear to be addressed to claims such as claim 13 of the reexamined '542 Patent, which recite that "*at least a portion of said underside is characterized by absence of said thin metallic coating, said plastic cutlery article being composed of a light transmitting plastic material*."  (Dkt.1 Exh. B col.2 ll.18-21 (italics in original).)  Sabert alleges that the underside of its cutlery products is entirely coated with metal (Dkt.18 ¶¶ 144(a), 145(a)), and that its products are not comprised of light transmitting plastic (*id.* ¶¶ 144(b), 145(b)).  *But other claims of the reexamined '542 Patent, such as claim 1, do not include these limitations*.  (*See,* Dkt.1 Exh. B col.1 ll.27-44, cl.1.)

Sabert's third argument of noninfringement is the allegation that Sabert's products "are coated with stainless steel to a thickness of less than 1000 nanometers . . . ."  (Dkt.18 ¶¶ 144(c), 145(c).)  But rather than being a basis for noninfringement, *this is an admission of infringement of claims such as claim 1*, which requires a coating of steel or stainless steel with a thickness of

"less than about 2000 nanometers . . . ."  (Dkt.1 Exh. B col.1 ll.37-42.)[2]  Thus, if any assertion by

a party in this case was made in bad faith, it was Sabert's purported *denial* of infringement.

> **3.    Sabert's Previous Failure To Plead Inequitable Conduct Precludes A Plausible Assertion That WNA "Knew" Its Patent Was Unenforceable Due To Inequitable Conduct**

With regard to the possibility of Sabert proving "bad faith" on the basis of WNA

asserting its patent knowing that the patent is unenforceable due to inequitable conduct, this

theory too is implausible and inconceivable.

On September 24, 2009, in connection with its efforts to reinstate the DJ Action, Sabert

provided the Court and WNA with a "draft" of the Amended [sic; supplemental] Complaint it

wished to pursue if and when that action was reinstated.  (DJ Action Dkt.22-2; copy attached as

Exh. A.)  *Nowhere* in that draft, however, did Sabert accuse WNA of inequitable conduct, either

in the original prosecution or in the reexamination.

And as noted above, the letter to customers about which Sabert complains was dated

November 6, 2009.  (Dkt.18 ¶ 308, Exh. E.)  But Sabert did not accuse WNA of inequitable

conduct until it filed its original answer in this case on December 1, 2009.  (Dkt.13.)

Accordingly, for Sabert to plead and prove bad faith based upon WNA writing to

customers on November 6, 2009, Sabert would have to show that WNA *knew* its patent was

unenforceable due to inequitable conduct *when Sabert itself had yet to make that accusation*.

This, too, is plainly not a plausible theory by which Sabert could avoid federal preemption.

---

[2] Sabert's allegation actually states that Sabert's products "are coated with stainless steel to a thickness of less than 1000 nanometers *in accordance with the prior art*."  (Dkt.18 ¶¶ 144(c), 145(c) (emphasis added).)  Sabert appears to be advancing a theory that it is "practicing the prior art."  But "[i]t is well established . . . that 'practicing the prior art' is not a defense to infringement."  *In re Omeprazole Patent Litig.*, 536 F.3d 1361, 1377 (Fed. Cir. 2008); *see also Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1153 (Fed. Cir. 2004) ("there is no 'practicing the prior art' defense to literal infringement").

4.     **Assertions Against Sabert Itself Cannot Be Tortious Interference**

Recognizing that Sabert's Seventh Counterclaim incorporates by reference the prior 297 paragraphs of Sabert's pleading (*see* Dkt.18 ¶ 298), we first note that in ¶¶ 40-42, Sabert alleges that it "advised" WNA that the original '542 Patent was unenforceable, and that WNA "knowingly asserted an invalid and/or unenforceable patent (the originally issued '542 Patent) *against Sabert*." (Emphasis added.) This could not be — and has not been alleged by Sabert to be — an act of tortious interference, which could apply (if at all) only to assertions of the patent *against Sabert's customers and prospective customers*, as opposed to assertions *against Sabert itself*. *See, e.g., Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1167 (3d Cir. 1993) ("what is actionable  is the luring away, by devious, improper and unrighteous means, the customer of another") (citations and quotations omitted); *Carpet Group Int'l v. Oriental Rug Importers Ass'n, Inc.*, 256 F. Supp. 2d 249, 289 (D.N.J. 2003).

Similarly, at the end of each of Sabert's first four counterclaims, Sabert alleges that WNA knew or should have known that it had no valid claim *against Sabert*. (*See* Dkt.18 ¶¶ 153, 189, 216, 264.) In each instance, that statement is part and parcel of an allegation that this infringement suit is an "exceptional case" warranting an award of attorney fees to Sabert. Thus, these allegations cannot and do not help Sabert in establishing a legal basis for its tortious interference claim, since the only party WNA sued is *Sabert*, not Sabert's *customers*.

But even if these allegations could somehow be construed as assertions made against Sabert's customers and/or prospective customers, Sabert still could not establish bad faith. As WNA has demonstrated, no attempt to argue bad faith under a theory that WNA knew that its patent was invalid, not infringed, or unenforceable, could survive a plausibility analysis.

\*                  \*                  \*

Accordingly, since Sabert has not alleged bad faith, and would have no nonfrivolous basis to assert a plausible case of bad faith, Sabert's Sixth Counterclaim is preempted by federal patent law, and thus fails to state a claim upon which relief may be granted.

### D.    Sabert's Demand For A Specific Amount Of Unliquidated Damages Should Be Stricken

Local Civil Rule 8.1 of this Court plainly states: "A pleading which sets forth a claim for relief in the nature of unliquidated money damages shall state in the *ad damnum* clause a demand for damages generally without specifying the amount."  Sabert violated this rule three years ago when it filed the DJ Action; and even though this violation was called to Sabert's attention, Sabert has now violated the rule once again here.

In Sabert's complaint in the DJ Action, as noted above in Part II.A, Sabert included a Count Three seeking damages in connection with its request for declaratory relief.  Sabert alleged in its complaint in the DJ Action that it was damaged in an amount believed to be in excess of $500,000.  (DJ Action Dkt.1 ¶ 37.)

In response to Sabert's complaint in the DJ Action, WNA moved (*inter alia*) to dismiss Sabert's Count Three for failure to state a claim.  In its brief in support of that motion, WNA added:

> Moreover, Sabert's assertion that it has been damaged "in an amount that has not yet been fully determined, but is believed to be in excess of at least $500,000" is in clear violation of Local Rule 8.1, which states:
>
> > A pleading which sets forth a claim for relief in the nature of unliquidated money damages shall state in the *ad damnum* clause a demand for damages generally without specifying the amount.
>
> This practice of alleging a meaningless damage number in a pleading has long been forbidden in the state and federal courts of New Jersey.  *See, e.g., Stuart v. Gambling Times, Inc.*, 534 F. Supp. 170, 171 n.2 (D.N.J. 1982) ("Plaintiffs also assert a specific amount sought in unliquidated damages, in direct contravention of [former] Local Gen.

Rule 8(G) [now L. Civ. R. 8.1]. This, however, is the least of the flaws in this action."); *see also* N.J. Court Rule 4.5-2.

Accordingly, if Count Three of Sabert's complaint can somehow survive in some form, at a minimum, the demand for unliquidated damages should be stricken from Sabert's complaint.

(DJ Action Dkt.6, at 19.)

On September 14, 2007, this Court dismissed Sabert's Count Three in the DJ Action, noting that Sabert had apparently abandoned the count altogether. (DJ Action Dkt.14, at 15.) In its order, this Court stated that: "Defendant's Motion to Dismiss Count Three of the Complaint, pursuant to Local Rule of Civil Procedure 8.1 is GRANTED . . . ." (DJ Action Dkt.15, at 2.)

Sabert has now done it again. In paragraph 319 of its present pleading (Dkt.18), which is part of Sabert's "Seventh Counterclaim" alleging tortious interference, asserts that Sabert has suffered damages "in an amount that has not yet been fully determined, but is believed to be in excess of at least $500,000." Sabert repeats this violation of Local Rule 8.1 in its prayer for relief, at paragraph 11, which is not specifically tethered to any of Sabert's counterclaims.

Sabert clearly knows this is improper. Yet Sabert continues to flout Local Civil Rule 8.1 with tabloid-style damage claims, which themselves acknowledge that any purported damage claim of Sabert is unliquidated. The Court should order these claims stricken.

IV.    **CONCLUSION**

For the reasons set forth herein, the Court should dismiss Sabert's counterclaim asserting inequitable conduct pursuant to Fed. R. Civ. P. 12(b)(6); the Court should strike paragraphs 18 and 19 of Sabert's inequitable conduct defenses under Fed. R. Civ. P.  12(f); the Court should dismiss Sabert's tortious interference claim pursuant to Fed. R. Civ. P. 12(b)(6) based upon federal preemption; and the Court should strike Sabert's damage claim pursuant to Local Civil Rule 8.1.

Respectfully submitted,

LERNER, DAVID, LITTENBERG,
 KRUMHOLZ & MENTLIK, LLP
*Attorneys for Defendant*
 *Waddington North America, Inc.*

Dated:_____December 23, 2009_____        By:_____s/  Roy H. Wepner_____
                                                    Roy H. Wepner