<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| WADDINGTON NORTH AMERICAN, INC., | )<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )   Civil Action No. 09-4883 (GEB) |
| SABERT CORPORATION, | )<br>)<br>)   ***MARKMAN*** **OPINION**<br>)<br>) |
| Defendant. | )<br>) |

<u>**BROWN, Chief Judge**</u>

This matter comes before the Court on requests from Waddington North American, Inc. ("WNA") and Sabert Corporation for claim construction in a *Markman* hearing. The parties submitted their Joint Claim Construction Chart ("JCC"), which identified nineteen (19) disputed terms. (JCC; Doc. No. 56). On July 8, 2010, the parties submitted their opening *Markman* briefs (Doc. Nos. 79, 80), and on September 20, 2010, the parties submitted their responsive briefs. (Doc. Nos. 96, 97.)

**I.    BACKGROUND**

This is a patent infringement case involving metallized plastic cutlery. Plaintiff, WNA, is the assignee of the single patent at issue, U.S. Patent No. 6,983,542 ("the '542 patent"), which is directed towards plastic eating utensils that are covered with a thin metallic coating that gives them the appearance of real metal cutlery. (Compl. at ¶ 12; Doc. No. 1.) After the '542 patent issued, Sabert Corporation ("Sabert") notified WNA of its belief that the '542 patent was

1

anticipated by prior art and WNA filed for reexamination.  (*Id.* at ¶13)  After WNA amended its claims to the satisfaction of the examiner, the PTO issued a reexamination certificate ("the '542 reexam") that found the amended claims were patentable over the prior art.  (Compl., Ex. A; Doc. No. 1.)

WNA filed a Complaint (Doc. No. 1) against Sabert for infringement of the '542 patent and the parties requested a *Markman* hearing.  On October 13, 2010, the Court held a *Markman* hearing and decided the construction of nine (9) of nineteen (19) terms and set forth its reasons on the record.  The remaining ten terms are the subject of this opinion.

## II.  DISCUSSION

### A.  Standard of Review

The first step in a patent infringement analysis is to define the meaning and scope of the claims of the patent.  *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 976 (Fed. Cir. 1995) (*en banc*), *aff'd*, 517 U.S. 370 (1996).  Claim construction, which serves this purpose, is a matter of law exclusively for the court.  *Id.* at 979.  Specifically, the focus of a court's analysis must begin and remain on the language of the claims, "for it is that language that the patentee chose to use to 'particularly point[] out and distinctly claim[] the subject matter which the patentee regards as his invention.'"  *Interactive Gift Express, Inc.  v. Compuserve, Inc.,* 256 F.3d 1323, 1331 (Fed. Cir. 2001) (quoting 35 U.S.C. § 112, ¶ 2).

Generally, there is a presumption that the words of a claim will receive the full breadth of their ordinary meaning.  *NTP, Inc. v. Research In Motion, Ltd.*, 392 F.3d 1336, 1346 (Fed. Cir. 2004).  The ordinary meaning may be derived from a variety of sources; including intrinsic evidence, such as the claim language, the written description, drawings, and the prosecution history; as well as extrinsic evidence, such as dictionaries, treatises, or expert testimony.  *Id.*

2

When determining the meaning of the terms, the court must give primary consideration to the intrinsic evidence. A court may also consider extrinsic evidence when an analysis of the intrinsic evidence alone does not resolve the ambiguities of a disputed claim term. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582-83 (Fed. Cir. 1996). However, the court must "attach the appropriate weight to . . . those sources." *Phillips*, 415 F.3d at 1324.

The presumption of ordinary meaning may be rebutted if the patentee acted as his or her own lexicographer by clearly setting forth a definition of the claim term unlike its ordinary and customary meaning. *Brookhill-Wilk 1, LLC. v. Intuitive Surgical, Inc.*, 334 F.3d 1294, 1298-99 (Fed. Cir. 2003). Any intent by the patentee to redefine a term must be expressed in the written description and must be sufficiently clear. *Merck & Co, Inc. v. Teva Pharms. USA, Inc.,* 395 F.3d 1364, 1370 (Fed. Cir. 2005). When a patent applicant specifically defines a claim term in its description of its invention, that definition controls. *Philips v. AWH Corp.*, 415 F.3d 1303, 1316 (Fed. Cir. 2005) (*en banc*) ("In such cases, the inventor's lexicography governs."). The Federal Circuit has "repeatedly encouraged claim drafters who choose to act as their own lexicographers to clearly define terms used in the claims in the specification." *Sinorgchem Co. v. ITC*, 511 F.3d 1132, 1136 (Fed. Cir. 2007).

When the patentee has not provided an explicit definition of a claim term, the words of a claim are given their plain and ordinary meaning to a person of ordinary skill in the art. *Vitronics*, 90 F.3d at 1582. The person of ordinary skill in the art is deemed to read the claim terms in the context of the entire patent, including the specification. *Phillips*, 415 F.3d at 1313.

B.     Application

Most of Sabert's claim construction arguments are related to its contentions that the claims of the reexamined patent lack sufficient written description in the specification of the original patent or are indefinite and cannot be construed. Both of these arguments are more appropriately addressed at summary judgment. Lack of written description is most appropriately addressed at summary judgment, and, while indefiniteness has the same construction underpinnings as a *Markman* hearing, two reasons make it more appropriate to defer it until summary judgment: (1) its potentially dispositive, patent-invalidating nature and (2) the high burden of proof required to show indefiniteness.

First, there is a high burden of proof on a party challenging the patent based on indefiniteness, which would be difficult to meet at this early stage. Indefiniteness is proven only "where an accused infringer shows by *clear and convincing* evidence that a skilled artisan could not discern the boundaries of the claim" based on the intrinsic evidence or knowledge of the relevant art area. *Halliburton Energy Servs., Inc.*, *v. M-I LLC,* 514 F.3d 1244, 1249-50 (Fed. Cir. 2008) (emphasis added). Second, rather than giving meaning to a claim, as a *Markman* hearing is meant to do, indefiniteness invalidates the patent claims entirely. *Exxon Research & Eng'g Co. v. United States*, 265 F.3d 1371, 1376 (Fed. Cir. 2001). This dispositive effect is more appropriately tackled at summary judgment. Thus, this Court finds persuasive the determinations of several other courts to defer indefiniteness until summary judgment. *See*, *e.g.*, *Intergraph Hardware Techs. Co. v. Toshiba Corp.*, 508 F. Supp. 2d 752, 773 n.3 (N.D. Cal. 2007) ("[The] indefiniteness argument is inappropriate at the claim construction stage."); *Pharmastem Therapeutics, Inc. v. Viacell Inc.*, 2003 U.S. Dist. LEXIS 877, at *2 n.1 (D. Del. Jan. 13, 2003) ("[T]he court will not address the defendants' indefiniteness argument at [the

*Markman* stage]."). Indeed, the Federal Circuit in *Halliburton*, *Exxon*, and *Datamize* reviewed courts that dismissed the case for indefiniteness at summary judgment, not at a prior *Markman* hearing. *Halliburton*, 514 F.3d at 1249; *Exxon*, 265 F.3d at 1373; *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005).

It may be true that determining the indefiniteness of claim language is a question of law "that is drawn from the court's performance of its duty as the construer of patent claims," which is the same duty that gives rise to the *Markman* hearing. *Exxon*, 265 F.3d at 1373. However, this does not outweigh the previous practical considerations that militate against determining indefiniteness prior to the end of fact or expert discovery. Consequently, with one exception, the Court will not entertain the indefiniteness arguments and will construe all terms "amenable to construction, however difficult that task may be[.]" *Exxon*, 265 F.3d at 1375.

In addition, because of their similarly dispositive nature, the Court will defer arguments concerning lack of written description and lack of enablement.

> 1. *Wherein said thin metallic coating is characterized by its suitability for food contact without an overcoat, and is at least one of steel and stainless steel.*
> Claim 1

Plaintiff contends that this term means "a thin metallic coating made of steel or stainless steel [that] has durability and lack of toxicity in various use situations, conditions, and environments such that it can be employed on cutlery used with food without the need for an overcoating used as a barrier." (Joint CC Chart at 9; Doc. No. 56).

Defendant's proposed construction breaks the term down into two parts. First, Defendant suggests that the words "suitability for food contact" should be ignored as a limitation because the "language is functional, not structural, and does not serve to define what the claimed structure is." (Joint CC Chart at 6; Doc. No. 56.) Thus, Defendant does not suggest any

5

construction for this portion of the term.  Second, Defendant proposes that a "thin metallic coating . . . without an overcoat, [and is at least one of steel and stainless steel]" should mean "there is no thin overcoat of a curable clear coating on the thin metallic coating, and wherein the thin metallic coating is one metal selected from the group consisting of silver, steel, stainless steel, chromium, aluminum, copper, and gold."  (Joint CC Chart at 5; Doc. No. 56.)  This construction represents Defendant's argument that there was no written description to support the patentee selecting steel and stainless steel out of the set of metals in the original specification because it never distinguished which metals could be safely used without an overcoat.

The Court adopts Plaintiff's construction because both durability and lack of toxicity are supported by the intrinsic evidence.  There is a functional element to the term "suitability for food contact," but the specification and the prosecution history give the reader enough context to understand what is meant by the term.

The support for durability and lack of toxicity will be addressed separately, followed by a discussion of the remaining issues involved in the construction of this term.

*a.     Durability*

The intrinsic evidence supports construing "suitability for food contact" to require durability of the coating in a variety of food environments.  Durability of the metallic coating is supported in the specification by the inventor's concern about abrasion resistance and adhesion of the coating to the plastic.  The specification states that

> <u>One method of improving abrasion resistance</u> involves coating the cutlery item with a light transmitting heat- or UV-curable coating, which serves to seal-off the deposited metal layer.  Such coating compositions are well known in the art and are used to provide a barrier overcoat over a variety of articles including Compact disks and DVDs.  FDA approved compositions of hardenable clear coatings, which can be applied by spraying, are also readily available for covering food service articles.

> Another way to improve resistance to abrasion is subjecting the cutlery item to a flame or Corona treatment for increasing the surface energy of the cutlery item.
>
> .   .   .   .
>
> To determine that the coated cutlery could be used against various foods, which could affect the coating or cause it to peel-off, the cutlery was subjected to confirmatory tests in a variety of food environments. Tests included subjecting cutlery to . . . boiling water-vinegar mixture, lemon juice, coffee . . . and ice cold water . . . . It must be noted that the coated cutlery is susceptible to scratches due to abrasion as any ordinary metal cutlery.

('542 patent, 10:57-11:27) (emphasis added.) The inventors tested the coatings in several types of abrasive foods in order to test its abrasion resistance and the quality of its adhesion when in contact with food. (*See also* '542 patent, 11:6-17 (discussing methods to enhance adhesion of the metallic coating).) The inventors discussed two different way to improve abrasion resistance (quoted above) and two ways to improve adhesion of the metallic coating to the plastic base (not quoted). ('542 patent, 10:57-11:27.) Thus, the inventors were concerned with the abrasion resistance and adhesion when the coating was in contact with food, which shows that it is important to the coating's "suitability for food contact."[1]

Further, the specification specifically describes abrasion resistance and adhesion as measures of the "durability" of the coating:

> Tape peel tests are normally used for testing the adhesion between the cutlery item surface and the metal layer deposited thereon. Adhesion is also related to abrasion resistance or durability of the coating.

('542 patent, 10:51-56.) Thus, consistent with Plaintiff's construction, which requires the metallic coating to have durability sufficient for food contact, durability is directly related to the coating's suitability for food contact. These entries in the specification give a person of ordinary skill in the art sufficient guidance on how to determine and achieve sufficient durability. The specification also provides several methods for improving adhesion and sets forth tests—tape

---

[1] The Court notes that an overcoating is one, but not the only suggested method of improving this durability.

7

peel tests and testing the coating in various abrasive foods—to determine whether the coating is sufficiently durable. Thus, "suitability for food contact" requires durability in a variety of food environments.

### b. *Lack of Toxicity*

The ordinary meaning of "suitability for food contact" and the intrinsic evidence support a construction that includes lack of toxicity. The ordinary meaning of the words from the claim term "suitability for food contact" includes lack of toxicity. A piece of cutlery is not suitable for food contact if it is toxic. If a person uses a piece of toxic cutlery on their food, that toxicity will enter the body and harm the person. As such, the plain meaning of the term and the subject matter of the patent, cutlery, mandate a construction that does not allow the metallic coating to be toxic because it touches food.

Additionally, the three portions of the specification and prosecution history lend support for this construction. First, when discussing an overcoat, the specification mentions Food and Drug Administration ("FDA") approval for overcoats. ('542 patent; 10:57-65; *see also* '542 patent, 3:31-35.) Thus, the specification makes clear that, at least when considering overcoats, which were part of the claims prior to reexamination, the safety that comes with FDA approval is important. Second, in the Background of the invention, the specification explains that difficulties arise when using metallic inks in plastics:

> [E]nvironmental and food contact issues associated with cutlery further limit the use of metallic inks and carrier solvents that can be used for imparting a metallic look.

('542 patent, 3:3-5.) Third, the prosecution history on reexamination mentions that aluminum was removed from the claims because it is toxic without an overcoat:

8

> As noted in amended Claim 1, the invention of the '542 patent teaches that metallic coatings can be applied to the article without necessarily requiring an over coating. The Spir-It/OakHill cutlery product lines used a surface overcoat . . . . Surface over coating was need as to prevent Aluminum from migrating into food which is nether desirable nor safe due to Aluminum toxicity. The plastic over coating is a separate secondary process, and therefore adds to the time and manufacturing costs.

(Pl.'s App. at 45.)

Therefore, the plain meaning of "suitability for food contact" and the intrinsic evidence suggest that lack of toxicity should be included in the construction of the term.

### c. *Remaining issues*

The remaining difference between the two constructions is that Defendant construes "and is at least one of steel or stainless steel" to mean "is one metal selected from the group consisting of silver, steel, stainless steel, chromium, aluminum, copper, and gold." (Joint CC Chart at 6; Doc. No. 56.) While all seven metals are disclosed in the specification, that is not a reason to construe steel and stainless steel to include five other metals. Steel and stainless steel were not redefined in the specification to include these metals and the law does not require a patentee to claim everything that is disclosed in the specification. *See Johnson & Johnston Associates, Inc. v. R.E. Service Co., Inc.,* 285 F.3d 1046, 1054-1055 (Fed.Cir.2002) (subject matter disclosed but not claimed may not be regained using the doctrine of equivalents). As a result, steel and stainless steel mean just that – steel and stainless steel – and do not include any other metals.

Consequently, this Court construes "wherein said thin metallic coating is characterized by its suitability for food contact without an overcoat, and is at least one of steel and stainless steel" to mean "a thin metallic coating made of steel or stainless steel which has durability and lack of toxicity in various use situations, conditions, and environments such that it can be employed on cutlery used with food without the need for an overcoating used as a barrier." Because this

9

discussion resolves the issues involved in construing "suitability [or suitable] for food contact without an overcoat"; "a thin metal layer suitable for food contact without an overcoat"; and "a thin metallic coating selected from the group consisting of steel and stainless steel deposited on at least a portion of said plastic cutlery article without an overcoat," the Court construes them accordingly.

The Court defers Defendant's arguments for lack of written description in the original specification for suitability of any metal without an overcoat and indefiniteness until summary judgment.

### 2. *Less than about 2000 nanometers* and *Less than 2000 nanometers*
Claims 1, 25, 38, 43 and 45

Plaintiff proposes that the word "about" should be construed to mean a 10% tolerance above 2000 nanometers, or 2200 nanometers and that "less than 2000 nanometers" does not require construction because it means what it says. (JCC at 6-7; Doc. No. 56.) Defendant conceded the 10% tolerance at the *Markman* hearing.

Other than the construction of "about," which was conceded at the *Markman*, this term does not require construction. "Less than 2000 nanometers" is clear in its meaning. "Less than" has a well known meaning to even a lay person, and, in the scientific world, "nanometers" has a well known meaning as a measure of small distances.

Defendant's only remaining arguments are lack of written description for selecting 2000 nanometers as the top end of the thickness range and its argument that there is no lower end of the range, causing the claim to be indefinite. (JCC at 6-7; Doc. No. 56.) These arguments are more appropriately addressed as dispositive motions. However, the Court notes that there is a lower limit in every independent claim (and thus every dependent claim as well). The claims create a lower limit by requiring that the "thin metallic coating is of a sufficient thickness to

10

impart a reflective metal-like appearance to the plastic cutlery article" or a similar limitation. ('542 reexam, 1:39-40, 2:11-14, 2:51-53, 3:2-4, 3:27-28.)

Therefore, this Court construes "about" to allow a 10% tolerance above the cited nanometer measurement and finds that the remaining portion of the claims do not require construction. This discussion also resolves the issues presented in the following claim terms: "said thickness being less than . . . nanometers"; "said thin metallic coating is less than . . . nanometers in thickness"; "less than 1000 nanometers"; "less than about 500 nanometers"; and "less than about 200 nanometers." The Court construes those terms accordingly.

### 3. *Reflective metal-like appearance*
Claims 1, 25, 38, 43 and 45

This term, which is present in every independent claim, appears in the larger context of two phrases that provide the lower limit of the metallic coating's thickness: "wherein said thin metallic coating is of a sufficient thickness to impart a reflective metal-like appearance to the plastic cutlery article" and "whereby a reflective metal-like appearance is imparted to at least a portion of said cutlery article." ('542 reexam, 1:39-40, 2:11-14, 2:51-53, 3:2-4, 3:27-28.)

Plaintiff proposes that "reflective metal-like appearance" should be construed to mean "the items simulate the metallic upscale appearance of solid metal cutlery." (JCC at 11; Doc. No. 56). At the *Markman* hearing Plaintiff conceded that "upscale" need not be included in its construction.

Defendant's arguments have shifted somewhat. In the Joint Claim Construction Chart, Defendant proposed simply that this term, in the context of the two larger phrases, is functional and not structural, and thus should be ignored.[2] (JCC at 11-12; Doc. No. 56.) In Defendant's briefing on the matter, it asserted that the claims are indefinite because a person of ordinary skill

---

[2] This is related to Defendant's argument that the "less than 2000 nanometers" family of terms is indefinite for lack of a lower extreme.

in the art cannot translate the functional language into meaningfully precise claim scope and that the subjective language renders the claim indefinite. (Def.'s Br. at 28-31; Doc. No. 80.) Finally, at the *Markman* hearing Defendant explained that the different "metal-like" finishes contribute to the indefiniteness of this term because metal-like finishes could include mat metal-like finishes, black metal-like finishes, orange copper metal-like finishes, and dull metal-like finishes.

The Court rejects these arguments and adopts its own construction that is similar to Plaintiff's construction. The Court construes "reflective metal-like appearance" as "the items simulate the metallic appearance of solid metal cutlery and have an optical density greater than 1." This construction is supported by the plain meaning of the term and the specification.

The plain meaning of the term suggests that a "reflective metal-like appearance" would look like metal. In the context of cutlery, this would suggest that it looks like the solid metal commonly used in the field, specifically, shiny stainless steel.

This construction is further supported by the specification. In the Background of the invention, the specification discloses the need in the art that the patent fills. It states,

> From the foregoing, it can be readily appreciated that there is a need for cutlery implements that offer the disposability of plastic cutlery and the upscale perception of <u>real stainless steel flatware</u>. Thus, imparting a metallic appearance to disposable plastic cutlery would enhance the perceived value and quality of the cutlery items. A metallic appearance would also lead to greater acceptance of disposable cutlery, as worthy replacements for metal flatware, for use at various events and occasions by caterers and other food-service establishments.

('542 patent, 2:18-28) (emphasis added.) Thus, the reflective appearance should include the "perception of real stainless steel flatware," and, consistent with Plaintiff's construction, they should simulate the appearance of solid metal cutlery. This is also supported by the Summary of the Invention, which states that "[o]ne of the objects of the invention is provide premium

disposable cutlery . . . having a metallic surface appearance that simulates genuine metal flatware." ('542 patent, 4:31-35.) Again, this portion of the specification suggests that the items should "simulate" the look of the real thing, genuine metal flatware. Finally, the specification states that:

> An improved plastic cutlery article should be fabricated primarily from plastic materials, yet have the appearance of genuine metal on the outer surface such that it is practically visually indistinguishable from fine metal cutlery.

('542 patent, 4:20-24.) The fact that the items must be visually indistinguishable from fine metal cutlery provides support for the construction that the "items simulate the appearance of solid metal cutlery." Thus, the Court finds substantial support in the intrinsic evidence for the portion of Plaintiff's construction that construes "reflective metal-like appearance" to mean "the items simulate the metallic appearance of solid metal cutlery."

However, the specification discloses information that provides more specificity about what kinds of coatings simulate the metallic appearance of metal cutlery. It discloses that "[o]ptical density values of around 1.5 are considered acceptable for the purpose of metallized cutlery. At optical density values of 1 and under the metal layer tends to be very thin and lacking adequate opacity for imparting an attractive metallic appearance on the part surface." ('542 patent, 10:38-44.) This quote explains that the attractive metallic appearance that is required to fulfill the invention's purpose does not exist at optical density values of 1 and under. Therefore, metal layers imparting optical densities less than this are not within the claim term. As a result, the Court construes "reflective metal-like appearance" to mean "the items simulate the metallic appearance of solid metal cutlery and have an optical density greater than 1."

Defendant's arguments do not require the Court to alter this construction. The Court finds that the claim term is not indefinite because there is sufficient guidance in the claim

13

language itself and in the specification to provide this term with meaning.  The Court chooses to decide this question of indefiniteness because it is difficult to fully construe the term without some discussion of indefiniteness.

As mentioned, the statutory requirement that a patentee distinctly claim his invention is violated when the claim is so "insolubly ambiguous" that "a person of ordinary skill in the art could not determine the bounds of the claims[.]"  *Halliburton*, 514 F.3d at 1246.  Such a violation renders the claim term void for indefiniteness.  However, "if the meaning of the claim is discernible, even though . . . the conclusion may be one over which reasonable persons will disagree," the claim is sufficiently clear to avoid indefiniteness.  *Exxon*, 265 F.3d at 1375.  Indeed, a term is not indefinite merely because it fails to define the scope of the claim with "mathematical precision" or contains some ambiguity.  *Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007), *cert. denied*, 128 S. Ct. 615 (2007).

"Apparatus claims are not necessarily indefinite for using functional language." *Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008).  In fact, functional language does not void the claim where the language merely fails to provide "specificity that in some instances would have been easy to provide and would have largely obviated the need to address the issue of indefiniteness."  *Exxon*, 265 F.3d at 1376.

Similarly, when a court is "faced with a purely subjective phrase . . . [it] must determine whether the patent's specification supplies some standard for measuring the scope of the phrase." *Datamize, LLC v. Plumtree Software, Inc.,* 417 F.3d 1342, 1351 (Fed. Cir. 2005).  Even if the claim terms themselves are completely ambiguous, a patentee can provide examples in the specification to clarify his meaning.  *See, e.g.*, *Oakley, Inc. v. Sunglass Hut Int'l*, 316 F.3d 1331, 1341 (Fed. Cir. 2003) (holding that, at the preliminary injunction stage, the accused infringer had

14

not shown a substantial question of indefiniteness where the specification explained the claim term "vivid colored appearance" with a calculation for differential effect and then provided examples of things that were and were not sufficient to create a "vivid colored appearance").

Further, the law is clear that if the specification or the knowledge in the art provides guidance to the person of skill in the art to further define a vague term, it is not indefinite. In *Exxon*, the court found that objective measures in the art that would help a person of skill in the art to define an otherwise vague and functional term allow the term to avoid indefiniteness. *Id.* at 1380. The term to be construed was "'for a period sufficient' to attain a 30% increase in catalyst productivity." *Id.* at 1378. Among other reasons, the court relied on the fact that government's expert conceded that such period could be ascertained by conducting activity checks. *Id.* at 1380.

To begin this process, the Court must determine the level of ordinary skill in the art. The Court accepts Defendant's definition of a person of ordinary skill in the art to be a person with a bachelor's in science or engineering or three to four years experience in the field of manufacturing metallic coated articles using PVD (physical vapor deposition) technologies. (Vergason Decl. at ¶17; Doc. No. 61.)

Even accepting Defendant's proposed level of skill in the art, the term "reflective metal-like appearance" is not indefinite for three reasons: (1) the claim term itself is not insolubly ambiguous to one of ordinary skill in the art; (2) the specification and claims give examples of objective measures that provide guidance on the meaning of the term; and (3) the ambiguity in the language is not related to ascertaining the meaning of the term but relates only to determining whether a product infringes.

First, the term "metal-like appearance" is not indefinite because it is easily understandable in the art. While they might occasionally disagree in a marginal case, even lay people would know what a "metal-like appearance" means. *See Exxon*, 265 F.3d at 1375-76 (to avoid indefiniteness, the terms need not be absolutely clear, but only be clear enough to define the invention.)   Defendant has presented no reason that a person of ordinary skill in the art would have a different opinion of what was required to simulate the metallic appearance of solid metal.  Indeed, Defendant's own expert, Gary Vergason, suggests that an experiment could be conducted to determine "the critical minimum thickness that plastic cutlery coated with steel (depending on the type) first imparts an acceptable reflective metallic appearance[.]"  (Vergason Decl. at ¶57; Doc. No. 61; *see also id.* at ¶47.)   This reveals that although tests would need to be conducted,[3] the person conducting the tests would be able to determine what constituted a reflective metallic appearance.  Thus, a person of ordinary skill in the art would know what the term meant; the only thing he would not know is what nanometer thickness it corresponded to.  Therefore, a person of ordinary skill would know what the term entailed, even if it was not claimed with "mathematical precision." *See Acumed* LLC, 483 F.3d at 806.  Thus, the term is not indefinite.

Second, in addition to the test described by Vergason, the specification itself provides examples of an objective test that can be conducted to determine if the coating is sufficiently thick.  The specification states, "[o]ptical density values of around 1.5 are considered acceptable for the purpose of metallized cutlery.  At optical density values of 1 and under the metal layer tends to be very thin and lacking adequate opacity for imparting an attractive metallic appearance on the part surface."  ('542 patent, 10:38-44.)   It further provides that "[i]ncrease in metal layer

---

[3] This discussion reveals that Vergason's expert report is really directed more towards enablement than indefiniteness.

16

thickness is directly proportional to optical density; hence optical density measurements can be used to define the thickness of the metal deposited on the surface." (*Id.* at 10:35-38.) Optical densities are a measurement that can easily be conducted by those with skill in the art. (*See* Decl. of Dr. McClure, at ¶¶8, 12.) Thus, like in *Exxon*, there are objective tests that a person of ordinary skill could perform to determine whether there was sufficient density to create the claimed invention. The claims themselves also provide examples of acceptable metallic thicknesses. The terms provide for thicknesses of less than 2000 nanometers, less than 1000 nanometers, less than about 500 nanometers, and less than about 200 nanometers, demonstrating that these thicknesses are sufficient to achieve the invention.

Third, Defendant's assertion of ambiguity of this language has little to do with a person of ordinary skill in the art's understanding; the difficulty only occurs at the margins and is primarily relevant to determine whether a product infringes. However, "[t]he test for indefiniteness does not depend on a potential infringer's ability to ascertain the nature of its own accused product to determine infringement, but instead on whether the claim delineates to a skilled artisan the bounds of the invention." *Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1372-73 (Fed. Cir. 2008), *cert. denied*, 129 S. Ct. 1595 (2009). Here, the terms themselves are clear even if they may make it somewhat difficult to design around the invention. The Court finds that the term is not indefinite.

The cases cited by Defendant do not change this disposition. This case is easily distinguishable from *Halliburton*, where "fragile gel" was found indefinite because, while it had to be capable of suspending drill cuttings and weighing materials, nothing in the record suggested what degree of such capability was sufficient. 514 F.3d at 1253. Here, parts of the specification give substantial guidance for how to determine how much metal is sufficient to

impart a "reflective metal-like appearance." This case is also different than *Datamize*, where the Federal Circuit found that the term "aesthetically pleasing" was "completely dependent on a person's subjective opinion." 417 F.3d at 1350. Here, the reflectivity of a metal, which must be sufficient to "simulate the metallic appearance of solid metal cutlery" is not as subjective. It does not depend on personal taste, but rather on a technical matter that some people might disagree about in a borderline situation. Thus, this case is more like *Acumed*, where the court found that "curved" in the context of an orthopedic nail was not indefinite because "claim construction need not always purge every shred of ambiguity." 483 F.3d at 806.

Similarly, the failure to specify the type of metal finish does not render the claim indefinite. The context of the invention, which is to provide plastic cutlery that is indistinguishable from "real stainless steel flatware" ('542 patent, 2:18-28), combined with the fact that the claims identify only steel and stainless steel as coatings, suggest that the type of finish is a shiny, silver-colored finish. While cutlery with other finishes does exist, the patentee did not specify that the invention intended to emulate this type of cutlery in the specification. These other finishes are unusual enough that the patentee would likely have set them forth in the specification if he had intended to include them in the scope of the claim because a person reading the patent would not call those finishes to mind when contemplating a metal-like appearance that emulates metal cutlery. Consequently, the Court finds that the patentee meant, and the skilled artisan would understand, that the type of finish claimed is the type that is on the vast majority of all metal cutlery – a shiny, silver-colored finish.

Thus, this Court finds that "reflective metal-like appearance" is not indefinite and construes it to mean "the items simulate the metallic appearance of solid metal cutlery and have an optical density greater than 1."

### III. CONCLUSION

For the reasons stated herein, the Court construes "wherein said thin metallic coating is characterized by its suitability for food contact without an overcoat, and is at least one of steel and stainless steel" to mean "a thin metallic coating made of steel or stainless steel which has durability and lack of toxicity in various use situations, conditions, and environments such that it can be employed on cutlery used with food without the need for an overcoating used as a barrier"; construes "less than about 2000 nanometers" to mean "less than 2200 nanometers"; finds that "less than 2000 nanometers" does not require construction; and construes "reflective metal-like appearance" to mean "the items simulate the metallic appearance of solid metal cutlery and have an optical density greater than 1." Several other terms mentioned in this opinion are construed in similar manners based on overlapping issues; their constructions are set forth in the accompanying order. Further, for the reasons set forth on the record during the *Markman* hearing, the Court construes the remaining terms as set forth in the accompanying order.

Dated: October 27, 2010

                                                    /s/ Garrett E. Brown, Jr.
                                                GARRETT E. BROWN, JR., U.S.D.J.